# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# SOUTHERN DIVISION
## No. 7:07-CV-134-D

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. KAREN WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| JOHN J. PECK, | ) | |
| | ) | |
| Defendant. | ) | |

On August 9, 2007, Karen Ward ("Ward") filed a sealed complaint as a qui tam relator under the False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA") [D.E. 1]. Pursuant to section 3730(b)(4)(A), the United States ("government") elected to intervene and filed a complaint in intervention [D.E. 21]. The complaint in intervention alleges that attorney John J. Peck ("Peck") fraudulently qualified certain clients for Medicaid through a series of transactions involving client assets that created the appearance that Peck's clients were indigent, resulting in false Medicaid claims in violation of the FCA. Compl. [D.E. 21] 4–7. Peck denied any wrongdoing [D.E. 38].

On November 13, 2012, after the court denied Peck's motion for summary judgment [D.E. 98], the parties notified the court that they had reached a settlement. See [D.E. 103–104, 111]. Without admitting any liability, Peck agreed to pay $100,000.00 to resolve the case. The settlement agreement expressly does not address whether Ward may recover attorneys' fees under the FCA from Peck or the amount of any such fees. See [D.E. 111-1] 2. On December 11, 2012, Ward filed a motion for attorneys' fees, along with supporting exhibits, requesting a total of $34,137.73 [D.E. 106]. On January 9, 2013, Peck filed a response opposing Ward's motion [D.E. 108]. Ward and the

government replied [D.E. 109, 112–113]. As explained below, the court grants Ward's motion for attorneys' fees and awards $34,137.73 in fees.

I.

In early December 2005, Ward went to the hospital to visit her brother, Robert Ward. See Ward Dep. [D.E. 66-2] 32–33. While at the hospital, Ward learned about her brother's business interests from her sister-in-law and several of her brother's employees. See Ward Resp. Opp'n Summ. J. [D.E. 66] 4; Ward Dep. 32–33. Ward verified the information about her brother's business with Peck, who was Robert Ward's close friend and business associate. Ward Dep. 33–35. On December 10, 2005, Robert Ward died. Ward Compl. [D.E. 1-3] ¶ 28.

After her brother's death, Ward learned that Peck was the trustee of Robert Ward's estate. Ward Dep. 34. Ward spoke with Peck about her need to get health insurance. Id. 74–75. Peck told Ward that he would have her qualified for Medicaid. Id. 75. Ward found Peck's statement odd because Ward knew her brother to be "a man of means" and would want her "to be taken care of." Id. Ward told Peck that she wanted health insurance, not Medicaid. Id. 76. Peck replied that "he qualified people for Medicaid." Id. 77. Ward looked at Peck's website and saw that Peck advertised that he qualified people for Medicaid and Medicare. Id.

Peck filed numerous claims against Robert Ward's estate on behalf of Peck's other clients and sent Ward a spreadsheet listing promissory notes and deeds of trust that the claimants held. See Ward Resp. Opp'n Summ. J. 5; see Ward Dep. 78–79. The spreadsheet listed transactions under the names "Floyd," "Grose," "Parnell," "Watson," "Forhan," "Collier," "Dyson," and "Norris." See [D.E. 66-1] 13–14. Ward became suspicious about the nature of the claims and suspected they might relate to Peck's Medicaid and Medicare practice. Ward Dep. 80–81. Ward then searched online registries of deeds for the counties in which the claimants against her brother's estate resided.

2

She found documents showing promissory notes that Peck entered concerning estate properties after her brother's death.

Ward then contacted the New Hanover County Department of Social Services and asked to speak with someone who handled Medicaid claims. Id. 84. Ward spoke with B.J. Anderson, who could not tell Ward if the claimants were Medicaid recipients, but stated that she "knew of Mr. Peck." Id. 85. Anderson gave Ward the contact information for Reta Shiver ("Shiver"), the Director of Social Services in Pender County, North Carolina. Id. 86. When Ward contacted Shiver, Shiver said that she had "had trouble with Mr. Peck." Id. 89–90. Shiver sent Ward a newspaper article that discussed a Medicaid loophole that some attorneys were exploiting. Id. 90; see [D.E. 66-1] 4–5.

The article described a loophole that allowed a Medicaid claimant to purchase a life estate—an asset that would not be counted for purposes of determining Medicaid eligibility—and transfer that asset to a family member, thereby creating the appearance of poverty despite the claimant's substantial assets. [D.E. 66-1] 4–5. The article further described use of the loophole as "clear abuse" but "nothing illegal." Id. 5 (quotations omitted). The article stated that Shiver discovered the loophole "after a local attorney continually tried to use the loophole." Id. 4.

Ward then retained counsel. Following an investigation, Ward filed her qui tam complaint under seal. In the complaint, Ward alleged that Peck advised Harry Grose ("Grose") and Marilyn Grose to transfer certain assets into Robert Ward's name through a series of transactions to qualify Grose for Medicaid funds. Ward Compl. ¶¶ 18–26. After Robert Ward's death, Peck filed a claim on behalf of Marilyn Grose against Robert Ward's estate based upon a promissory note. Id. ¶¶ 34–37. Ward alleged that the Groses failed to disclose the promissory note to Medicaid as one of their assets. Id. ¶ 39. Ward asserted that both Peck and Marilyn Grose violated the FCA. Id. ¶¶ 42–43. Ward further alleged that "it appears likely that at least some of the other claims" against her

3

brother's estate involved Medicaid fraud. Id. ¶ 40. Along with her sealed complaint, Ward submitted a notebook of information in which she identified numerous other claims involving alleged Medicaid fraud. See 31 U.S.C. § 3730(b)(2).

After a prolonged investigation, the government decided to intervene. On January 8, 2010, the government filed its complaint in intervention. In the government's complaint, the government clarified that the transfers were "a series of transactions which started with the purported purchase of a life estate, but which ended with a note and deed of trust being payable to a trust created for the benefit of Peck's clients." Compl. ¶ 20. When applying for Medicaid benefits on behalf of his clients, Peck disclosed the purchase of the life estate, but did not disclose "the true transaction," which "was a loan provided by Peck's clients to Robert Ward (or his company), with a note and deed of trust given back to Peck's clients to secure [the] loan." Id. ¶¶ 19, 21. Peck undertook these transactions because "the ownership of a life estate would not disqualify his clients [from] Medicaid . . . , but the ownership of a note and deed of trust would." Id. ¶ 25. The life estates were based on the life of Robert Ward. Id. ¶ 23. Thus, had the life estate purchases been legitimate, Peck's clients would have lost the value of the assets loaned to Robert Ward upon his death. Id. The government alleged that Peck used such transactions to file fraudulent Medicaid applications on behalf of Marian Collier ("Collier"), Violet Forhan ("Forhan"), Thomas Leo Floyd ("Floyd"), and Mary Der Parnell ("Parnell"). Id. ¶¶ 27–72. Ward had identified these four individuals in the FCA submission that she made to the government. See 31 U.S.C. § 3730(b)(2).

## II.

The FCA authorizes the imposition of a civil penalty and treble damages against "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the United States government. 31 U.S.C. § 3729(a)(1)(A); see Am. Civil Liberties

4

Union v. Holder, 673 F.3d 245, 247–51 (4th Cir. 2011). The FCA allows the Attorney General to bring a civil action against any person who has violated section 3729. 31 U.S.C. § 3730(a). The FCA also empowers a private person to "bring a civil action for a violation of section 3729 for the person and for the United States Government . . . . in the name of the Government." Id. § 3730(b)(1). The government may elect to intervene in such a case. Id. § 3730(b)(2). When the government intervenes, the government "may amend the complaint, move to dismiss the action or certain claims, seek to settle the action, pursue the claims through alternative remedies, or litigate the action." Am. Civil Liberties Union, 673 F.3d at 250. However, "the qui tam relator remains a party to the action." Id.

If the government intervenes and successfully proceeds with the action, the person who brought the action "shall . . . receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim," or, where the action is based primarily on public disclosures of "specific information (other than information provided by the person bringing the action) . . . , the court may award . . . no more than 10 percent of the proceeds." 31 U.S.C. § 3730(d)(1). The person who brings the action in which the government intervened "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs. All such expenses, fees, and costs shall be awarded against the defendant." Id.

First, Peck argues that Ward is not entitled to attorneys' fees due to the public disclosure bar in 31 U.S.C. § 3730(e)(4). Section 3730(e)(4) states:

[n]o court shall have jurisdiction over an action under [section 3730] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought

5

by the Attorney General or the person bringing the action is an original source of the information.

Id. § 3730(e)(4) (2006).[1] Congress enacted section 3730(e)(4)'s public disclosure bar "to prevent 'parasitic' qui tam actions in which relators, rather than bringing to light independently-discovered information of fraud, simply feed off of previous disclosures of government fraud." United States ex rel. Siller v. Beckton Dickinson & Co., 21 F.3d 1339, 1347 (4th Cir. 1994). The public disclosure bar applies even after the government intervenes in a case. See Rockwell Int'l Corp. v. United States, 549 U.S. 457, 476–79 (2007). If the court lacks jurisdiction as to the relator due to the public disclosure bar, the relator must be dismissed. Id. at 478. The relator's original action under section 3730(b) then "becomes an action brought by the Attorney General" under section 3730(a). Id. at 478. In such a case, the relator is not entitled to a share of the proceeds or to attorneys' fees or costs. See id. at 479; cf. 31 U.S.C. § 3730(d) (permitting recovery of attorneys' fees for "an action brought by a person under subsection [3730](b)").

"When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009). The relator first must show that the allegations of her FCA claims were not "based upon" a public disclosure. Id. at 348. If the relator carries this burden, section "3730(e)(4)(a)'s public disclosure jurisdictional bar would

---

[1] After Ward filed her qui tam complaint, Congress amended section 3730(e)(4). See Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02 (2010). The changes do not apply to cases pending before the law was enacted. See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Watson, 559 U.S. 280, 283 n.1 (2010). Thus, the amendments do not impact the analysis.

6

Case 7:07-cv-00134-D   Document 117   Filed 08/23/13   Page 6 of 10

not apply." See id. However, if the relator fails to carry this burden, the relator then must bear "the separate and distinct burden of proving [her]self entitled to original source status." Id.

As for whether Ward based her allegations against Peck upon a public disclosure within the meaning of section 3730(e)(4), the court first considers which publicly disclosed information in this case can trigger section 3730(e)(4)'s jurisdictional bar. Section 3730(e)(4) bars actions based upon "public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media." 31 U.S.C. § 3730(e)(4). These statutory scenarios are the "exclusive . . . types of public disclosure that would defeat jurisdiction." Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 870 (4th Cir. 1999) (quotation omitted); see Schindler Elevator Corp. v. United States ex rel. Kirk, 131 S. Ct. 1885, 1891–92 (2011); United States ex rel. Beauchamp v. Academi Training Ctr., Inc., Case No. 1:11cv371, 2013 WL 1189707, at *13 & n.37 (E.D. Va. Mar. 21, 2013) (unpublished); United States ex rel. Green v. Serv. Contract Educ. & Training Trust Fund, 843 F. Supp. 2d 20, 32 (D.D.C. 2012).

Here, potential sources of public disclosure include newspaper articles, Peck's website, and the documents that Ward obtained online from county registries of deeds. As for whether the newspaper articles or Peck's website resulted in "the public disclosure of allegations or transactions," 31 U.S.C. § 3730(e)(4), the Fourth Circuit has not construed the phrase "allegations or transactions" in section 3730(e)(4). However, many other circuit and district courts that have considered the issue have adopted the D.C. Circuit's interpretation. See United States ex rel. Davis v. Prince, 753 F. Supp. 2d 569, 580 & n.17 (E.D. Va. 2011) (collecting cases). The D.C. Circuit defined "allegation" as "a conclusory statement implying the existence of provable supporting facts." United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 653–54 (D.C. Cir. 1994); see Davis, 753

7

F. Supp. 2d at 580. The D.C. Circuit defined "public disclosure of . . . transactions" as the public revelation of "a false state of facts and a true state of facts from which fraudulent activity may be inferred." Davis, 753 F. Supp. 2d at 580–81; see Springfield Terminal, 14 F.3d at 653–655.

Here, the newspaper articles refer only to a Medicaid "loophole" and do not allege any fraudulent activity. See [D.E. 66-1] 4–5; [D.E. 66-1] 10–11. Moreover, the newspaper articles do not mention Peck or any of his clients. The newspaper articles also fail to disclose any fraudulent transactions. Specifically, although the newspaper articles arguably reveal an alleged "false state of facts"—the transfer of assets to purchase a life estate, leaving people with few or no assets—they do not reveal an alleged "true state of facts"—that Peck had actually structured his clients' transfers as loans, allowing his clients to keep substantial hidden assets in the form of promissory notes. Similarly, Peck's website claimed that he could protect assets from Medicaid, but nothing in the record suggests that the website explained how or intimated that Peck would protect assets by fraud. See Ward Resp. Opp'n Summ. J. 4; Ward Compl. ¶ 15. Likewise, the documents that Peck retrieved from various county registries of deeds do not constitute "transactions in a criminal, civil, or administrative hearing, [or] in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation." 31 U.S.C. § 3730(e)(4). In sum, Ward did not base her qui tam action upon a "public disclosure" within the meaning of section 3730(e)(4). In light of this conclusion, the court need not address whether Ward qualifies as an original source under 31 U.S.C. § 3730(e)(4)(A). See Vuyyuru, 555 F.3d at 350; Siller, 21 F.3d at 1348.

Next, Peck argues that Ward is not entitled to recover attorneys' fees because the government's complaint in intervention did not adopt all of Ward's allegations. Specifically, Ward's complaint contended that Peck and Marilyn Grose filed false Medicaid claims for Harry Grose's nursing home expenses. Ward Compl. ¶¶ 42–43. However, the government's complaint in

8

intervention relied on four other individuals: Collier, Forhan, Floyd, and Parnell. See Compl. ¶¶ 27–72. Thus, according to Peck, Ward may not recover under 31 U.S.C. § 3730(d)(1).

The notebook that Ward provided to the government pursuant to the FCA's initial disclosure requirement included information about Collier, Forhan, Floyd, and Parnell. These allegations formed the basis of the government's complaint in intervention and ultimately produced the settlement. Accordingly, Ward is entitled to a percentage of the settlement under 31 U.S.C. § 3730(d)(1), and Ward may recover attorneys' fees under 31 U.S.C. § 3730(d)(1).

Next, Peck argues that the contingent fee agreement between Ward and her counsel precludes Ward from recovering attorney's fees under 31 U.S.C. § 3730(d)(1). The argument fails. See, e.g., United States v. Cooper Health Sys., Civil Action No. 08-5626 (JEI/AMD), 2013 WL 1707952, at *7–8 (D.N.J. Apr. 22, 2013) (collecting cases); United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp., 793 F. Supp. 2d 1260, 1266 & n.2 (D. Colo. 2011).

Finally, the court has reviewed the thorough submission of Ward's counsel. See [D.E. 106]. The court agrees with counsel's submission concerning a reasonable rate and finds that the requested hours are reasonable. Accordingly, the court has determined "a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 243 (4th Cir. 2009). The court has considered the other relevant factors discussed in Robinson and the entire record. See id. at 243–44. The court awards attorneys' fees of $34,137.73. The award includes $25,157.73 to Keith Williams and $8,980.00 to Gordon Widenhouse.

### III.

·In sum, Ward's request for attorneys' fees [D.E. 106] is GRANTED. Peck is liable to Ward for $34,137.73 in attorneys' fees.

9

SO ORDERED. This **23** day of August 2013.

JAMES C. DEVER III
Chief United States District Judge

10